UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, CALIFORNIA, ILLINOIS, MINNESOTA, NEW MEXICO, and VERMONT, and the DISTRICT OF COLUMBIA, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, UNITED STATES DEPARTMENT OF AGRICULTURE FOOD AND NUTRITION SERVICE, and SONNY PERDUE, in his official capacity as Secretary of Agriculture, <br><br> Defendants. | 19 Civ. 2956 (ALC) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2714
Fax: (212) 637-2686

CASEY K. LEE
Assistant United States Attorney
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................................1

BACKGROUND .........................................................................................................3

    A.  Congress's Flexibilities for the 2012 Rule's Sodium and Whole Grain
        Requirements, and the USDA's Subsequent Promulgation of the
        2018 Rule ......................................................................................3

        1.  The 2012 Rule's Sodium and Whole Grain Requirements...................3

        2.  Congress's Flexibilities for the 2012 Rule's Sodium and Whole
            Grain Requirements Prior to the 2018 Rule...........................................5

        3.  The 2018 Rule's Codification of Previously-Granted
            Flexibilities in Reducing Sodium Content and Increasing
            Whole Grain Consumption ..................................................................6

    B.  Plaintiffs' Sparse (and Factually Disputed) Allegations of Injury....................9

LEGAL STANDARDS .................................................................................................11

ARGUMENT .............................................................................................................12

I.      Plaintiffs Lack *Parens Patriae* Standing to Bring this Lawsuit ...........................13

    A.  The Weight of Authority Establishes that a State Cannot Bring a *Parens
        Patriae* Suit Against the Federal Government.................................................13

    B.  The District of Columbia Cannot Bring a *Parens Patriae* Action
        Against the Federal Government Because It Lacks the Requisite
        Sovereignty .......................................................................................17

II.     Plaintiffs Fail to Establish Constitutional Standing in Either a *Parens
     Patriae* or Proprietary Capacity.............................................................17

    A.  Even Assuming *Arguendo* That the Law Permits Plaintiffs to Bring
        *Parens Patriae* Suits Against the Federal Government, Plaintiffs Fail to
        Establish Constitutional Standing in That Capacity .......................................18

    B.  Plaintiffs Fail to Allege an Injury in Fact to Their Proprietary Interests
        Fairly Traceable to the 2018 Rule..................................................................21

CONCLUSION...........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Heckler*,
  582 F. Supp. 1155 (S.D.N.Y 1984) ............................................................... 14, 15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982)...................................................................................... 13, 21

*Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*,
  748 F.2d 760 (2d Cir. 1984) ................................................................................ 24

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
  821 F.3d 352 (2d Cir. 2016) ............................................................................... 14

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980) ............................................................................... 14

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016) ........................................................................... 11, 12

*City of N.Y. v. Heckler*,
  578 F. Supp. 1109 (E.D.N.Y. 1984) ....................................................... 14, 15, 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................................... 18, 19, 21

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994) ................................................................................. 22

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ............................................................................ 13

*District of Columbia v. John R. Thompson Co.*,
  346 U.S. 100 (1953)............................................................................................ 17

*Fadem v. Ford Motor Co.*,
  352 F. Supp. 2d 501 (S.D.N.Y. 2005) ................................................................. 19

*Fair Hous. in Huntington Comm., Inc. v. Town of Huntington*,
  316 F.3d 357 (2d Cir. 2003) ............................................................................... 24

*Garelick v. Sullivan*,
  987 F.2d 913 (2d Cir. 1993) ......................................................................... 18, 21

*Georgia v. Pa. R.R. Co.*,
  324 U.S. 439 (1945)............................................................................................ 13

*Gov't of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ................................................................... passim

*In re Multidistrict Vehicle Air Pollution MDL,*
    481 F.2d 122 (9th Cir. 1973) ........................................................................... 17

*In re Sofer,*
    613 F. App'x 92 (2d Cir. 2015) ....................................................................... 12

*Keepers, Inc. v. City of Milford,*
    807 F.3d 24 (2d Cir. 2015) .............................................................................. 13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................... 18, 23

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000) ..................................................................... 11, 12

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................................... 15, 16

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................................... 13, 15

*Michigan v. EPA,*
    581 F.3d 524 (7th Cir. 2009) ........................................................................... 13

*Missouri ex rel. Koster v. Harris,*
    847 F.3d 646 (9th Cir. 2017) ........................................................................... 18

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (2d Cir. 2018) .............................................................................. 15

*Nat. Res. Def. Council v. U.S. Food & Drug Admin.,*
    710 F.3d 71 (2d Cir. 2013) .............................................................................. 22

*Nevada v. Burford,*
    918 F.2d 854 (9th Cir. 1990) ..................................................................... 13, 15

*Noel v. Olds,*
    138 F.2d 581 (D.C. Cir. 1943) ........................................................................ 17

*Pennsylvania ex rel. Shapp v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ................................................................... 16, 22

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
    489 F.3d 1279 (D.C. Cir. 2007) ...................................................................... 22

*Purdue Pharma L.P. v. Kentucky*,
    704 F.3d 208 (2d Cir. 2013) ............................................................. 12

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ............................................................... 18

*Salve Regina Coll. v. Russell*,
    499 U.S. 225 (1991) ........................................................................ 15

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .............................................................. 18, 19

*State ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ......................................................... 13

*Thompson v. Cty. of Franklin*,
    15 F.3d 245 (2d Cir. 1994) .............................................................. 11

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ............................................................ 17

*Virginia ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ..................................................... 13, 21

*Wash. Util. & Transp. Comm'n v. FCC*,
    513 F.2d 1142 (9th Cir. 1975) ......................................................... 15

**Statutes**

5 U.S.C. § 701 .................................................................................... 3

D.C. Code § 38-822.02 ....................................................................... 11

Pub. L. 112-55 .................................................................................... 5

Pub. L. 113-235 .................................................................................. 5

Pub. L. 114-113 .................................................................................. 5

Pub. L. 115-31 .................................................................................... 5

Pub. L. 115-56 .................................................................................... 5

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ...................................... 1, 11

**Regulations**

7 C.F.R. § 210.19 ...................................................................................................... 8

77 Fed. Reg. 4088 ............................................................................................. passim

82 Fed. Reg. 56,703 .......................................................................................... passim

83 Fed. Reg. 63,775 .......................................................................................... passim

**Other Authorities**

Bill History of B22-0313, "Health Students Amendment Act of 2017,"
   http://lims.dccouncil.us/Legislation/B22-0313 ........................................... 11

California Department of Education, "School Meal Flexibilities for School Year 2018-19" (June
   2018), http://cde.ca.gov/ls/nu/sn/mbsnp132018.asp ................................. 9

Committee Report on B22-0313, "Healthy Students Amendment Act of 2017"
   (Oct. 25, 2018), *available at* http://lims.dccouncil.us/Download/38261/B22-0313-
   CommitteeReport1.pdf ............................................................................... 11

Fiscal Impact Statement (Dec. 3, 2018), *available at* http://lims.dccouncil.us/Download/38261/
   B22-0313-Amendment1.pdf f ....................................................................... 11

Introduction, B22-0313, "Healthy Students Amendment Act of 2017," *available at*
   http://lims.dccouncil.us/Download/38261/B22-0313-Introduction.pdf................................... 11

New York State Education Department, "Final Rule: Child Nutrition Program Flexibilities
   for Milk, Whole Grains, and Sodium Requirements" (July 1, 2019), http://cn.nysed.gov/
   final-rule-flexibilities ................................................................................. 9

"School Year 2019-2020: Flexibilities for Milk, Whole Grains, & Sodium,"
   http://cn.nysed.gov/common/cn/files/flexibilities-for-milk-whole-grains-sodium.pdf .............. 9

Defendants the United States Department of Agriculture ("USDA"), United States Department of Agriculture Food and Nutrition Service, and Secretary Sonny Perdue, sued in his official capacity (together, "Defendants"), by their attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss for lack of subject matter jurisdiction the complaint filed by the States of New York, California, Illinois, Minnesota, New Mexico, and Vermont (together, the "State Plaintiffs"), and the District of Columbia ("D.C.").  Dkt. No. 1 ("Compl.").  Defendants bring their motion pursuant to Federal Rule of Civil Procedure 12(b)(1).

## PRELIMINARY STATEMENT

Plaintiffs bring this lawsuit on their own behalf and in their putative *parens patriae* capacity, claiming that the promulgation of the USDA's 2018 Rule—which provides flexibilities for certain sodium and whole grain requirements in school meals adopted in a prior 2012 Rule— fell short of substantive and procedural requirements under the Administrative Procedure Act ("APA").  In doing so, Plaintiffs proffer a narrative where the 2012 Rule's multi-phased and progressively stricter nutritional standards for sodium and whole grains in school meals were more-or-less proceeding as enacted until the 2018 Rule imposed drastic changes.  That is simply not the case.

The reality (which Plaintiffs fail to recognize) is this:  For years—prior to the promulgation of the 2018 Rule—both Congress and the USDA granted flexibilities to the 2012 Rule's sodium and whole grain requirements similar to those in the 2018 Rule.  Plaintiffs, meanwhile, nowhere allege that these prior flexibilities actually harmed their proprietary interests or the health of schoolchildren in their respective jurisdictions, yet somehow claim that the 2018 Rule's flexibilities might do so.  This (and other defects in the Complaint) falls well

short of establishing standing to bring this action.  In short, under a full picture of relevant facts (explained below) concerning the 2012 Rule, the promulgation of the 2018 Rule, and the flexibilities granted through Congressional and agency action in between, Plaintiffs lack standing to bring this APA lawsuit, which should therefore be dismissed.

At the outset, Plaintiffs cannot demonstrate standing to bring this suit in any *parens patriae* capacity.  The Supreme Court, and five Courts of Appeals to consider the issue, have held in unmistakable terms that a state cannot bring a *parens patriae* action against the federal government—period.  This rule recognizes that a state has no legal interest in protecting its citizens from the federal government, and that only the United States, not the states, may represent its citizens and ensure their protection under federal law in federal matters.  Similarly, D.C. cannot bring a *parens patriae* suit against the federal government because it is not a sovereign entity, and because cities (such as D.C.) cannot bring *parens patriae* suits.  But even if such *parens patriae* suits were permissible, Plaintiffs here fail to allege an actual or imminent injury resulting from the 2018 Rule.  Plaintiffs instead merely speculate that the 2018 Rule "will expose" school children to possible adverse health effects, which does not suffice to plead an injury in fact.

Plaintiffs' efforts to plead individual-capacity standing to sue fare no better.  Plaintiffs add speculation to speculation, essentially alleging that they *may* pay for the healthcare costs of schoolchildren that *may* suffer detrimental health consequences from the 2018 Rule.  Plaintiffs also acknowledge that the 2018 Rule's sodium and whole-grain flexibilities are minimum requirements that do not interfere with their respective rights to create and enforce their own laws, and that they are free to enact stricter requirements if they so choose.  Instead, the State Plaintiffs allege that they will face an "increased regulatory burden" if they do adopt stricter

2

requirements, yet do not allege that they have adopted such requirements, or that the enactment of such requirements is imminent.  And D.C.'s enactment of a law—before the 2018 Rule's promulgation—implementing the 2012 Rule's whole-grain requirement (but not the sodium requirement) cannot establish standing, since D.C. was in the process of adopting that requirement months *before* the 2018 Rule's promulgation, and made a finding that this stricter requirement would have no fiscal impact on its budget or financial plan.  D.C. thus fails to allege any harm that is fairly traceable to the 2018 Rule.

For these reasons and others delineated below, Plaintiffs' claims should be dismissed for lack of subject matter jurisdiction.

## BACKGROUND

### A.    Congress's Flexibilities for the 2012 Rule's Sodium and Whole Grain Requirements, and the USDA's Subsequent Promulgation of the 2018 Rule

Plaintiffs' claims arise under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., raising substantive and procedural challenges to a rule the USDA promulgated in late 2018, 83 Fed. Reg. 63,775 (Dec. 12, 2018) ("2018 Rule") regarding certain nutrition standards for the National School Lunch and School Breakfast Programs.  *See* Compl. ¶ 10.  Plaintiffs contend that the 2018 Rule loosened nutritional standards for sodium and whole grains in school meals previously adopted in 2012, 77 Fed. Reg. 4088 (Jan. 26, 2012) ("2012 Rule"), without proper notice and opportunity to comment on these modifications, and without adequate basis in research or guidelines allegedly required by statute.  *See* Compl. ¶¶ 9-14.

### 1.    The 2012 Rule's Sodium and Whole Grain Requirements

Among other mandates, the 2012 Rule required schools participating in the National School Lunch and School Breakfast Programs "to make a gradual reduction in the sodium content of [school] meals."  2012 Rule at 4097.  Participating schools were required to meet

certain sodium reduction targets from the then-average content in school meals on a ten-year timeline—a sodium content reduction of about 25 percent in school breakfasts, and of more than 53 percent in school lunches—with two intermediate targets for schools to meet during that timeline. *Id.* at 4097-98, 4147, 4155. Within two years of the 2012 Rule's implementation ("Target 1"), or the 2014-2015 school year, schools were required to reduce sodium in school breakfasts by about five percent to seven percent, and in school lunches by about 10 percent. *Id.* Within five years of the 2012 Rule's implementation ("Target 2"), or the 2017-2018 school year, schools had to reduce sodium in school breakfasts by about 15 to 17 percent, and in school lunches by about 32 percent. *Id.*

In setting these limits, the 2012 Rule acknowledged that meeting Target 2 might require schools "to incorporate new low-sodium products and ingredients in meals," *id.* at 4098, and "build student acceptance of lower sodium meals," *id.* at 4097, and "food manufacturers . . . to reformulate products," *id.* The rule noted further that meeting the final target "will require innovation on the part of product manufacturers in the form of new technology and/or food products." *Id.* at 4098. And while "[n]early all schools ha[d] to reduce the sodium content of school meals to meet final sodium targets," "the extent of the needed reduction varie[d] by school/district as sodium limits for school meals d[id] not currently exist." *Id.*

The 2012 Rule also imposed a minimum whole grain-rich requirement for school meals. 2012 Rule at 4093, 4144-45, 4155-56. Regarding school breakfasts, beginning in the 2013-2014 school year, the 2012 Rule required half of grain products schools offered to be whole grain-rich, or at least 50% whole grains. *Id.* at 4093, 4155-56. For the 2014-2015 school year and beyond, the Rule required schools to serve only whole grain-rich products. *Id.* at 4093, 4156. With respect to school lunches, the Rule required half of grain products offered in school years 2012-

4

2013 and 2013-2014 to be whole grain-rich, and required all grain products to be whole grain-rich in school year 2014-2015 onward. *Id.* at 4093, 4144-45.

      2.      **Congress's Flexibilities for the 2012 Rule's Sodium and Whole Grain Requirements Prior to the 2018 Rule**

Prior to the 2018 Rule's promulgation, between late 2011 and 2017, Congress repeatedly enacted legislation providing flexibilities for the sodium and whole grain requirements specified in the 2012 Rule. *See* 82 Fed. Reg. 56,703, 56,703-704 (Nov. 30, 2017) ("2017 Interim Rule").

In late 2011, Congress prohibited implementation of a sodium reduction target stricter than Target 1 of the 2012 Rule (then a proposed rule) "until the Secretary certifies that the [USDA] has reviewed and evaluated relevant scientific studies and data relevant to the relationship of sodium reductions to human health." Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. 112-55 § 743(2), 125 Stat. 552, 589 (Nov. 18, 2011). Congress reiterated that restriction to Target 1 in late 2014, barring funding for the implementation of "any regulations" or "any other law that would require a reduction in the quantity of sodium contained in federally reimbursed meals, foods, and snacks sold in schools below Target 1 . . . until the latest scientific research establishes the reduction is beneficial for children." Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235 § 752, 128 Stat. 2130, 2171 (Dec. 16, 2014) ("2015 Act"). Congress renewed this prohibition yet again in late 2015, and in 2017, thereby limiting the sodium reduction requirement to Target 1 through the 2017-2018 school year. *See* 2017 Interim Rule at 56,704.[1]

---

[1] *See also* Consolidated and Further Continuing Appropriations Act, 2016, Pub. L. 114-113 § 733(b), 129 Stat. 2242, 2280 (Dec. 18, 2015) ("2016 Act"); Consolidated and Further Continuing Appropriations Act, 2017, Pub. L. 115-31 § 747(b), 131 Stat. 135, 176 (May 5, 2017) ("2017 Act"); Continuing Appropriations Act, 2018, Pub. L. 115-56 div. D § 101(a), 131 Stat. 1129, 1139 (Sept. 8, 2017) ("2018 Act").

5

With respect to the 2012 Rule's whole grain requirements, Congress mandated in late 2014 that the USDA "Secretary shall allow States to grant an exemption from" the only-whole-grain-rich products requirement, and "the States shall establish a process for evaluating and responding, in a reasonable amount of time, to requests for an exemption."  2015 Act § 751, 128 Stat. at 2171.  Congress further provided that such an exemption would require a school food authority to demonstrate hardship "in procuring specific whole grain products which are acceptable to the students and compliant with the whole grain-rich requirements."  *Id.*  Under an exemption, half (instead of all) of a school's grain product offerings were required to be whole grain-rich.  *Id.*  Congress subsequently renewed this exemption scheme through the 2017-2018 school year.  *See* 2017 Interim Rule at 56,704; *see also* 2016 Act § 733(a), 129 Stat. at 2279-80; 2017 Act § 747(a), 131 Stat. at 176; 2018 Act div. D § 101(a), 131 Stat. at 1139.

In November 2017, the USDA promulgated the 2017 Interim Rule, which retained Target 1 as the applicable sodium reduction requirement, and Congress's whole grain exemption scheme, for the 2018-2019 school year.  2017 Interim Rule at 56,704, 56,706-710.  The 2017 Interim Rule acknowledged that Congress's "repetitive legislative action manifest[ed] a clear, Congressional message to USDA: The current regulatory provisions limiting . . . whole grain-rich[] and sodium options . . . are causing operational challenges and need further consideration."  *Id.* at 56,709.  "The interim final rule reflect[ed] Congressional direction and provide[d] Program operators certainty in local-level procurement and menu planning operations during" the 2018-2019 school year.

### 3. The 2018 Rule's Codification of Previously-Granted Flexibilities in Reducing Sodium Content and Increasing Whole Grain Consumption

The 2018 Rule, which took effect on February 11, 2019, codified (among other things) flexibility in reducing the sodium content of school meals and increasing the whole grain

products offered—leeway that had been previously granted in Congressional legislation and the 2017 Interim Rule.  2018 Rule at 63,775.  Relevant here, the 2018 Rule extended Target 1's sodium reduction requirement through the end of the 2023-2024 school year, transitioned to Target 2's requirements by the 2024-2025 school year, and eliminated the 2012 Rule's final sodium targets that would have gone into effect in school year 2022-23.  2018 Rule at 63,776, 63,782-83, 63,787-88.

The 2018 Rule acknowledged that "[s]chool children are consuming a considerable amount of sodium," and noted that "[i]t is important that the sodium level in school meals is gradually reduced to assist in introducing children to lower sodium foods."  *Id.* at 63,787.  The sodium reduction flexibilities provided by the 2018 Rule "balance[d] the needs for strong nutrition standards with the operational concerns and student acceptance of school meals" by allowing schools "to slowly introduce lower sodium foods to students and for industry to develop consistent lower sodium products that are palatable for students."  *Id.*  Further, they provided the additional time needed for the USDA to assess the review of the Dietary Reference Intakes—"a set of reference values used to plan and assess the diets of healthy individuals and groups," *id.* at 63,782—for sodium intake, which (at the time) was being undertaken by the National Academies, Sciences, Engineering, and Medicine, *id.* at 63,783, 63,787; the USDA also sought to assess the impact of the new Dietary Guidelines for Americans, which were expected to be released by the end of 2020.  *Id.*  The flexibilities provided by the 2018 Rule "allow[ed] for any adjustments to be made, including regulatory changes, to incorporate any updated scientific information regarding sodium."  *Id.* at 63,787.

The 2018 Rule also required at least half of grain products in school meals be whole-grain-rich (as was the case for the first year or two years under the 2012 Rule), but dispensed

with the requirement that schools later serve only whole-grain-rich products—and, by extension, with Congress's above-described exemption process that authorized states to permit school food authorities that demonstrated hardship to have half (instead of all) of their grain product offerings be whole grain-rich. *Id.* at 63,776, 63,780-81, 63,786. "This decision was made to reduce Program operator burden while still providing children access to whole grain-rich items." *Id.* at 63,786. The 2018 Rule noted that "[t]he requirement to offer exclusively whole grain-rich products proved impractical for many school districts" and "was never fully implemented nationwide" "due to a long history of administrative and legislative actions allowing exemptions," including the several exemptions and flexibilities directly provided by Congress. *Id.* at 63,781. The Rule acknowledged that "the vast majority (80 percent) of school food authorities strived to meet the [all-whole-grain-rich] requirement and did not request exemptions" from state agencies in school year 2017-2018, but that about 20 percent of school food authorities (totaling over 4,000 authorities) "still face[d] challenges and appl[ied] for exemptions," *id.* at 63,786, and nearly all (4,124 out of 4,297) "received exemption approval from their State agency," *id.* at 63,781. The USDA "recognize[d] that it is not feasible to operate" the school breakfast and lunch programs "in an ad hoc fashion, with recurrent exemptions, without giving operators and the food industry a workable regulatory solution that provides the long-term certainty they need for food procurement and product reformulation." *Id.*

The 2018 Rule makes clear that its sodium and whole grain flexibilities are minimum nutritional standards, and that States are free to impose additional or stricter requirements. *See* 2018 Rule at 63,781, 63,783; *see also* 7 C.F.R. § 210.19(e) (State agency may "impos[e] additional requirements for participation in the [National School Lunch] Program which are not inconsistent with the provisions of this part"). Indeed, Plaintiffs have acknowledged as much.

*See* Compl. ¶ 126.  For example, New York's Education Department issued a memorandum noting that the 2018 Rule "increases flexibility in the Child Nutrition Program requirements related to . . . grains[] and sodium," and that "[t]he purpose of this rule is to ease operational burden and provide school nutrition professionals the flexibility needed to successfully operate the Child Nutrition Programs."[2]  New York further recognized that "[p]rogram operators may exceed these minimum requirements," note 2, *supra*, and included in its training materials (available on the New York State Education Department's website) a PowerPoint slide deck reiterating that "[s]odium and whole grain-rich requirements in [National School Lunch Program]/[School Breakfast Program] set a floor and not a ceiling," and "[s]tate agencies have discretion to set stricter standards that are not inconsistent with Federal requirements."[3]

**B.      Plaintiffs' Sparse (and Factually Disputed) Allegations of Injury**

Plaintiffs bring this lawsuit in their putative *parens patriae* capacity on behalf of their "residents and citizens," "including children," and on their own behalf.  Compl. ¶¶ 18-24; *see also id.* ¶¶ 103-04.  Plaintiffs seek to "protect the health of schoolchildren in their States,"[4] *id.* ¶ 2, and speculate that "[t]he 2018 Rule will *expose* children who live in the States and eat meals in schools to health consequences to which they would not have been exposed if USDA had not

---

[2] New York State Education Department, "Final Rule: Child Nutrition Program Flexibilities for Milk, Whole Grains, and Sodium Requirements" (July 1, 2019), http://cn.nysed.gov/final-rule-flexibilities.

[3] "School Year 2019-2020: Flexibilities for Milk, Whole Grains, & Sodium," http://cn.nysed.gov /common/cn/files/flexibilities-for-milk-whole-grains-sodium.pdf.  California's Department of Education also issued a bulletin noting that the 2017 Interim Rule's sodium and whole grain flexibilities "assist[ed] schools in serving healthy and appealing school meals," and that it expected the 2018 Rule to be published in fall 2018.  *See* California Department of Education, "School Meal Flexibilities for School Year 2018-19" (June 2018), http://cde.ca.gov/ls/nu/sn/ mbsnp132018.asp.

[4] As noted in the Complaint, Plaintiffs use the term "States" to refer collectively to the State Plaintiffs and D.C.  *See* Compl. 2 n.1.

eliminated the final sodium target, delayed" Target 2, "and lowered the whole grain

requirement," *id.* ¶ 106 (emphasis added).  Plaintiffs, however, nowhere allege that the continued

application of Target 1 since the promulgation of the 2012 Rule has resulted in any negative

health consequences to schoolchildren in their respective states or territories.  Instead, Plaintiffs

allege generally that "high sodium diets"—tellingly, not school meals meeting Target 1—

"adversely affect students' cardiovascular health and increase the risk of chronic cardiovascular

disease," *id.* 107; Plaintiffs add that "[s]chool meals with higher levels of sodium and lower

whole grains pose particular harm to children and adolescents who have elevated risk factors for

cardiovascular disease and other health problems due to obesity," *id.* ¶ 109—without any

allegation that the application of sodium reduction Target 1, or the grant of any exemption to the

all-whole-grain-rich product requirement, has in fact harmed the health of any schoolchildren on

whose behalf Plaintiffs purport to bring suit.

Plaintiffs then attempt to claim various harms to their respective proprietary interests.

Plaintiffs allege that the 2018 Rule may cause children with obesity to suffer negative health

consequences, *id.* ¶ 109; that childhood obesity "is associated with" approximately $3 billion in

"direct medical costs," *id.* ¶ 110; and that Plaintiffs pay health care costs, not necessarily for

children with obesity, but rather for "eligible low-income and moderate-income residents,

including children," *id.* ¶ 111.

Separately, Plaintiffs allege that "States that promulgate their own stricter requirements

as a result of the 2018 Rule will have an increased regulatory burden."  *Id.* ¶ 126.  But the

Complaint nowhere alleges that any State Plaintiff has, previously intended and/or attempted, or

presently intends to enact, any sodium or whole-grain requirement stricter than those in the 2018

Rule—let alone any resulting "increased regulatory burden."  The sole Plaintiff to have allegedly

enacted any stricter requirement, D.C., supposedly enacted the 2012 Rule's whole grain requirement (but not the sodium requirements)[5] "[i]n response to the 2017 Interim Final Rule," *id.* ¶ 127, and eight days prior to the promulgation of the 2018 Rule.[6]  The Complaint alleges that D.C. "will need to develop and implement its own training techniques and compliance tools," and that it "will have to make greater effort to procure whole grain rich products than it would have if [the 2018 Rule] had not lowered the 2012 Rule's whole grain requirement," *id.* ¶ 130. But D.C. proposed enacting the 2012 Rule's whole grain requirement as early as June 2017—before both the 2017 Interim Rule and the 2018 Rule.[7]  And D.C. expressly determined that the whole grain requirement it enacted would have *no fiscal impact* on its budget and financial plan.[8]

## LEGAL STANDARDS

The legal standards for a Rule 12(b)(1) motion to dismiss are well settled.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A dismissal for lack of constitutional or prudential standing is one for lack of subject matter jurisdiction.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016) (Article III standing); *Thompson v. Cty. of Franklin*, 15 F.3d 245, 247-48 (2d

---

[5] D.C.'s law enacting the 2012 Rule's whole grain requirement in fact *repealed* D.C.'s pre-existing restrictions on sodium levels in school meals.  *See* D.C. Code § 38-822.02, *available at* https://code.dccouncil.us/dc/council/code/sections/38-822.02.html; Committee Report on B22-0313, "Healthy Students Amendment Act of 2017" at 3, 6 (Oct. 25, 2018), *available at* http://lims.dccouncil.us/Download/38261/B22-0313-CommitteeReport1.pdf.

[6] *See* Bill History, http://lims.dccouncil.us/Legislation/B22-0313 ("Bill History" tab).

[7] *See* Bill History, *supra* note 6; B22-0313 Introduction ll. 130-37, *available at* http://lims.dccouncil.us/Download/38261/B22-0313-Introduction.pdf.

[8] Fiscal Impact Statement (Dec. 3, 2018), *available at* http://lims.dccouncil.us/Download/38261/B22-0313-Amendment1.pdf ("This amendment will not have an impact on the District's budget and four-year financial plan.").

Cir. 1994) (prudential standing); *see also In re Sofer*, 613 F. App'x 92, 92 (2d Cir. 2015)

("Prudential standing remains a jurisdictional requirement in our Circuit.").

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or

fact-based." *Carter*, 822 F.3d at 56. "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely

on the allegations of the complaint . . . the plaintiff has no evidentiary burden." *Id.* "The task of

the district court is to determine whether the [complaint] alleges facts that affirmatively and

plausibly suggest that the plaintiff has standing to sue." *Id.* (quotation marks and brackets

omitted). "Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion,

proffering evidence beyond the" complaint. *Id.* at 57. Under such circumstances, "[a] plaintiff

asserting subject matter jurisdiction has the burden of proving by a preponderance of the

evidence that it exists." *Makarova*, 201 F.3d at 113. "In opposition to such a motion, the

plaintiff[] will need to come forward with evidence of their own to controvert that presented by

the defendant" if the defendant's evidence "reveal[s] the existence of factual problems in the

assertion of jurisdiction." *Carter*, 822 F.3d at 56 (quotation marks omitted). "If the extrinsic

evidence presented by the defendant is material and controverted, the district court will need to

make findings of fact in aid of its decision as to standing." *Id.*

## ARGUMENT

"States generally file suit in federal court in" two capacities relevant here: "*parens

patriae* suits in which States litigate to protect quasi-sovereign interests"; or "proprietary suits in

which the State sues much like a private party suffering a direct, tangible injury." *Purdue

Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013). Under either capacity, "[t]he party

invoking federal jurisdiction bears the burden of establishing prudential and constitutional

standing." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015).  Plaintiffs have failed to meet that burden here.

I.      **Plaintiffs Lack *Parens Patriae* Standing to Bring this Lawsuit**

      A.      **The Weight of Authority Establishes that a State Cannot Bring a *Parens Patriae* Suit Against the Federal Government**

The State Plaintiffs cannot establish *parens patriae* standing to bring this case, primarily because they fail to overcome well-established prudential limits on standing.  "A State does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982); *accord Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923).  The Courts of Appeals have correctly read "the Supreme Court's clear statement in *Snapp*" to bar *parens patriae* suits against the federal government.  *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990); *see also Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80 (D.C. Cir. 2019); *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009); *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).  This prohibition is "designed to prevent a State from encroaching on the federal government's power," *Bernhardt*, 923 F.3d at 180, and "rests on the recognition that a state possesses no legitimate interest in protecting its citizens from the government of the United States," *Cuccinelli*, 656 F.3d at 269. "As the [Supreme] Court has long recognized, only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009); *accord Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 446 (1945).

To be sure, the bar on *parens patriae* suits is not absolute; rather, as a form of "prudential standing," *Bernhardt*, 923 F.3d at 180; *Keepers*, 807 F.3d at 39, it "can be modified or abrogated

by Congress," *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (quotation marks omitted).  But "the APA" (under which Plaintiffs bring their claims) "evinces no congressional intent to authorize a State as *parens patriae* to sue the federal government." *Bernhardt*, 923 F.3d at 181.  That statute "is not linked to any particular statutory scheme and . . . does not create an inference that the Congress intended a wholesale imprimatur allowing a State as *parens patriae* to sue the federal government." *Id.*

Plaintiffs marshal various attempts to circumvent this prohibition, none of which are availing.  *See* Dkt. No. 35 at 2.  At the start, Plaintiffs claim that the Second Circuit "ha[s] long held that a state may bring a *parens patriae* suit against a federal agency." *Id.* (citing *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980)).  But to the extent it endorsed *parens patriae* standing, *Carey* has been superseded by the Supreme Court's decision in *Snapp*, and, at any rate, the language Plaintiffs rely on is mere *dicta*, since the Second Circuit held separately that New York had standing based on a direct injury.  *Carey*, 637 F.2d at 838.  Moreover, *Carey* relied on cases that did not involve the federal government as a defendant to opine in *dicta* that New York had standing in its capacity as *parens patriae*.  *Id.*

Plaintiffs then contend that the bar on *parens patriae* actions against the federal government is limited to state challenges to the validity of a federal statute, and does not apply where a state purports to seek to enforce federal law.  Dkt. No. 35 at 2.  That argument fails for several reasons.  *First*, Plaintiffs rely on two decisions within this District that apparently support their position, *Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y 1984), and *City of N.Y. v. Heckler*, 578 F. Supp. 1109 (E.D.N.Y. 1984).  Dkt. No. 35 at 2.  But both decisions relied on reasoning from a pre-*Snapp* Ninth Circuit decision that was subsequently overruled as a result of "the Supreme Court's clear statement in *Snapp*," *Burford*, 918 F.2d at 858.  *See Abrams*, 582 F.

14

Supp. at 1159 (citing *Wash. Util. & Transp. Comm'n v. FCC*, 513 F.2d 1142 (9th Cir. 1975), *overruled in relevant part*, *Burford*, 918 F.2d at 858); *City of N.Y.*, 578 F. Supp. at 1123 (same). Further, these district court decisions cannot overcome the above-identified weight of authority from the Fourth, Seventh, Ninth, Tenth, and D.C. Circuit Courts of Appeals, which have held to the contrary. *Cf. Salve Regina Coll. v. Russell*, 499 U.S. 225, 232 (1991) (while "trial judges often must resolve complicated legal questions without benefit of extended reflection or extensive information," "appellate judges are able to devote their primary attention to legal issues," and "[c]ourts of appeals . . . are structurally suited to the collaborative juridical process that promotes decisional accuracy") (quotation marks omitted).

*Second*, Plaintiffs argue that footnote 17 of the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), establishes an exception for *parens patriae* actions that seek to enforce, not invalidate, a federal statute. Dkt. No. 35 at 2. That is simply not so. For starters, "the Supreme Court had no need to carve out an exception to" the bar on *parens patriae* suits against the federal government "because Massachusetts did not sue in its *parens patriae* capacity," and "instead 'alleged a particularized injury in its capacity as a landowner.'" *Bernhardt*, 923 F.3d at 182 (quoting *Massachusetts v. EPA*, 549 U.S. at 522). "Because Massachusetts sued to remedy its own injury rather than that of its citizens, *Massachusetts v. EPA* is not a *parens patriae* case." *Id.*; *see also Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 103-04 (2d Cir. 2018) (relying on *Massachusetts v. EPA* for finding standing based on state's "well founded desire to preserve its sovereign territory").

Next, Plaintiffs' reliance on certain language from *Massachusetts v. EPA* is misplaced. Plaintiffs point to a discussion of the "critical difference between allowing a State to protect *her citizens* from the operation of federal statutes (which is what [*Massachusetts v. Mellon*, 262 U.S.

447 (1923)] prohibits) and allowing a State to assert *its* rights under federal law (which it has standing to do)," *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (emphasis added).  *See* Dkt. No. 35 at 2.  But "[t]he distinction is not," as Plaintiffs insist, "between two types of *parens patriae* lawsuits, one permissible and one not.  It is between a *parens patriae* lawsuit (what *Mellon* prohibits) and a State suing based on its rights under federal law (not a *parens patriae* lawsuit at all)."  *Bernhardt*, 923 F.3d at 182.  That language therefore does not support the distinction Plaintiffs seek.

*Third*, Plaintiffs' proffered exception makes little sense in that it nowhere indicates how a *parens patriae* action against the federal government to enforce a federal law would sidestep the rationales for the prohibition in *Snapp*—either by allaying concerns over "a State . . . encroaching on the federal government's power," *Bernhardt*, 923 F.3d at 180, and/or evincing any "legitimate interest in protecting [a state's] citizens from the government of the United States," *Cuccinelli*, 656 F.3d at 269.  To the contrary, "[t]he general supremacy of federal law means that the federal parens patriae power should not, as a rule, be subject to the intervention of states seeking to represent the same interest of the same citizens."  *Bernhardt*, 923 F.3d at 183 (quotation marks omitted).  "For that reason, a state can not have a quasi-sovereign interest because matters of federal law fall within the sovereignty of the Federal Government."  *Id.* (quotation marks and brackets omitted).  "Indeed, it is difficult to imagine how a state could more substantially intrude itself into the operations of the Federal Government than by challenging agency activity on the sole basis that the agency chose to structure its effort in a particular way."  *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 680 (D.C. Cir. 1976).

Put differently, "[i]t is the State's representation that usurps the role of the federal government, not the legal theory underlying its complaint."  *Bernhardt*, 923 F.3d at 183.  Thus,

"[t]here is no reason to treat *parens patriae* actions alleging constitutional claims against the federal government differently from those alleging federal statutory claims." *Id.* Indeed, courts have "doubt[ed] the Supreme Court meant in footnote seventeen [of *Massachusetts v. EPA*] to create an exception . . . based on such a distinction." *Id.*; *see also United States v. Apple, Inc.*, 791 F.3d 290, 324 (2d Cir. 2015) ("The Supreme Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.") (quotation marks omitted). The State Plaintiffs therefore lack *parens patriae* standing to bring this suit against the federal government.

**B.     The District of Columbia Cannot Bring a *Parens Patriae* Action Against the Federal Government Because It Lacks the Requisite Sovereignty**

D.C., "a municipal corporation," Compl. ¶ 24, is not a sovereign state and cannot bring a *parens patriae* suit against the federal government. "As the District of Columbia is subject to plenary legislative control by Congress, the United States, acting through Congress, occupies the position of *parens patriae*." *Noel v. Olds*, 138 F.2d 581, 587 (D.C. Cir. 1943); *see also District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 107 (1953) ("while the District [of Columbia] [is] a separate political community, its sovereign power [is] lodged in the Congress"). Further, as Plaintiffs' own cited authority confirms, a city such as D.C. "generally does not have *parens patriae* standing." *City of N.Y.*, 578 F. Supp. at 1123; *see also In re Multidistrict Vehicle Air Pollution MDL*, 481 F.2d 122, 131 (9th Cir. 1973) ("political subdivisions such as cities and counties . . . cannot sue as *parens patriae*"). D.C. therefore lacks *parens patriae* standing.

**II.     Plaintiffs Fail to Establish Constitutional Standing in Either a *Parens Patriae* or Proprietary Capacity**

Even if any Plaintiff could in some instances have *parens patriae* standing, Plaintiffs' allegations here do not demonstrate that they have constitutional standing to sue in either a *parens patriae* or individual capacity. To establish "the irreducible constitutional minimum of standing," Plaintiffs bear the burden of showing (among other things) that they "suffered an

injury in fact" that is "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quotation marks omitted). Demonstrating an injury in fact requires showing that a plaintiff "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (quotation marks omitted). The "threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

The traceability element requires that the injury is "not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and ellipsis omitted). While the traceability standard "is lower than that of proximate cause," *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), and "indirectness [of an injury] is not necessarily fatal to standing," *id.* (quotation marks omitted), standing "is ordinarily substantially more difficult to establish" with an indirect injury, *Lujan*, 504 U.S. at 562. Under such circumstances, a plaintiff must allege "facts establishing that all links in the causal chain are satisfied." *Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993). Applying these standards, Plaintiffs have failed to plausibly allege constitutional standing in this case.

A.    **Even Assuming *Arguendo* That the Law Permits Plaintiffs to Bring *Parens Patriae* Suits Against the Federal Government, Plaintiffs Fail to Establish Constitutional Standing in That Capacity**

"States asserting parens patriae standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017). Even assuming for argument's sake that state *parens patriae* suits against the federal government are permissible, *but see* Part I *infra*, Plaintiffs have not alleged an injury in fact to their *parens patriae* interests fairly traceable to the 2018 Rule.

18

Plaintiffs start by alleging a quasi-sovereign interest in "the health of schoolchildren in their States," Compl. ¶ 2, but nowhere allege that the promulgation of the 2018 Rule has led, or with certainty will lead, to health problems for schoolchildren.  Rather, Plaintiffs merely speculate that "[t]he 2018 Rule will *expose* children who live in the States and eat meals in schools to health consequences to which they would not have been exposed if [the 2018 Rule] had not eliminated the final sodium target, delayed" Target 2, "and lowered the whole grain requirement," *id.* ¶ 106 (emphasis added)—in other words, adverse health effects are just possible, not imminent.[9]  Plaintiffs also make various generalized allegations about "high sodium diets" and "particular harm" to children with certain types of risk factors, *see id.* ¶¶ 107, 109, but nowhere specify how the 2018 Rule's continued application of Target 1—itself a sodium level *reduction*—or the adoption of the half-whole-grain-rich-products standard poses an "actual" or "certainly impending" harm to schoolchildren within Plaintiffs' jurisdictions.  *See Spokeo, Inc.*, 136 S. Ct. at 1548; *Clapper*, 568 U.S. at 409.

Plaintiffs dearth of allegations on these fronts is especially telling because (as explained above, *see* pp. 5-6) prior to the 2018 Rule, the USDA—at Congress's behest—has implemented *only* sodium reduction Target 1 since the 2012 Rule's promulgation: Congress barred the use of any stricter sodium reduction target "until the latest scientific research establishes the reduction is beneficial for children."  2015 Act § 752, 128 Stat. at 2171.  Yet despite several years of school meals being offered under Target 1 (including for school year 2017-2018, when the 2012

---

[9] Plaintiffs subsequently claimed that "they allege that the [2018 Rule] *will* have adverse health consequences for schoolchildren."  Dkt. No. 35 at 3.  The plain text of the complaint makes clear that this is simply inaccurate.  This Court may thus disregard Plaintiff's assertion "because the allegation was not in plaintiffs' . . . complaint."  *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.").

Rule required use of the stricter Target 2, *see* 2012 Rule at 4097-98, 4147, 4155), Plaintiffs nowhere allege any harm to schoolchildren resulting from the application of Target 1, even over Target 2.  In addition, Plaintiffs nowhere allege that Congress's condition in prior years for use of a stricter sodium target—namely, that the latest scientific research established the benefits of the sodium reduction for children—has ever been met.

Similarly, Plaintiffs cannot gainsay that the 2012 Rule previously permitted school food authorities to offer whole grain-rich products for half of their grain product offerings for two years, *see* 2012 Rule at 4093, 4155-56, and that at one point, over 4,100 school food authorities were permitted (by exemption) to provide whole grain-rich products for half (instead of all) of their grain product offerings, 2017 Interim Rule at 63,781, 63,786.  Yet Plaintiffs fail to allege any facts suggesting that the application of the half-whole-grain-rich-products standard subjected schoolchildren within Plaintiffs' jurisdictions to any adverse health effects that were avoided by the only-whole-grain-rich requirement.  Nor do they allege facts tending to show, or explain why, the 2018 Rule harms public health as compared to the half-whole-grain-rich-products standard permitted for a time under the 2012 Rule.  For example, Plaintiffs make no allegations that schoolchildren who consumed school meals provided by the approximately 4,100 authorities granted an exemption (half of whose grain product offerings were permitted to be whole grain rich) suffered adverse health consequences avoided by school food authorities whose grain product offerings were all whole grain-rich.

In summary, Plaintiffs merely speculate that school children will suffer harm to their health as a result of the 2018 Rule; that does not suffice to plead an injury-in-fact.  Furthermore, Plaintiffs fail to allege that any supposed adverse health consequence to school children is "fairly traceable" to the promulgation of the 2018 Rule, given the absence of any allegations (let alone

evidence) that the implementation of similarly more-flexible sodium and whole-grain standards *prior* to the 2018 Rule resulted in health problems for schoolchildren.  Plaintiffs fail to provide the necessary link in the causal chain, *see Garelick*, 987 F.2d at 919, namely why the 2018 Rule itself would result in an injury to the health of school children when the at-issue more-flexible requirements were implemented—apparently without injury to school children's health—before the 2018 Rule was ever promulgated.  Plaintiffs therefore lack *parens patriae* standing.

### B.    Plaintiffs Fail to Allege an Injury in Fact to Their Proprietary Interests Fairly Traceable to the 2018 Rule

Similarly, Plaintiffs lack constitutional standing because they fail to allege an injury in fact to their proprietary interests, let alone one fairly traceable to the 2018 Rule.  To start, Plaintiffs essentially suggest that the more-flexible standards of the 2018 Rule may cause certain groups of children to suffer negative health consequences, who may then have higher health care costs, which Plaintiffs may have to pay.  *Id.* ¶¶ 109-11.  But as explained above, *see* Section II.A *supra*, Plaintiffs fail to allege any actual or imminent adverse health effects to schoolchildren in their jurisdictions, let alone resulting from the 2018 Rule.  Moreover, Plaintiffs nowhere allege that they have paid any additional health care costs for school children, or that such costs are "certainly impending" rather than just "possible"—let alone as a result of the 2018 Rule's promulgation.  *Clapper*, 568 U.S. at 409 (emphases omitted).

Plaintiffs also do not allege any injury to their sovereign interests.  "[O]nly when a federal law interferes with a state's exercise of its own sovereign 'power to create and enforce a legal code' does it inflict on the state the requisite injury-in-fact."  *Cuccinelli*, 656 F.3d at 269 (emphasis omitted) (quoting *Snapp*, 458 U.S. at 601).  Here, the Complaint includes no allegations that the 2018 Rule impeded any Plaintiff's efforts to create and enforce their own laws.  Indeed, the Complaint recognizes that the 2018 Rule permits Plaintiffs to impose stricter

nutrition standards in school meals if they wish to do so.  *See* Compl. ¶ 126 (citing 83 Fed. Reg. at 63,781, 63,783).  Plaintiffs therefore have not adequately alleged any injury to their sovereign interests, since they remain free to enact the stricter nutrition standards they espouse.

Instead, the State Plaintiffs and D.C. assert separate injuries:  the State Plaintiffs cryptically hypothesize, without elaboration, that "States that promulgate their own stricter requirements as a result of the 2018 Rule *will* have an increased regulatory burden," *id.* (emphasis added).  This allegation does not establish an injury in fact.  Standing must be assessed "as of the time the lawsuit is filed."  *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994).  Yet here, the Complaint does not allege that any of the State Plaintiffs has in fact adopted stricter sodium and/or whole-grain requirements as a result of the 2018 Rule, or suffered any consequent "increased regulatory burden."  Nor does the Complaint allege that, at the time of filing suit, the enactment of such stricter requirements was imminent.  Plaintiffs' allegations are precisely the type of conjecture that cannot show an injury in fact.

But even assuming for argument's sake that these allegations plead the requisite injury, they are simply not "fairly traceable" to Defendants' conduct.  "[A] plaintiff may not establish injury for standing purposes based on a self-inflicted injury."  *Nat. Res. Def. Council v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013).  Here, Plaintiffs actually acknowledge that the 2018 Rule imposes minimum standards that Plaintiffs are free to exceed through their own lawmaking.  Courts have recognized that, by setting a "floor (not a ceiling)" as a standard, the agency "in no way prevent[s]" others "from more effectively solving the . . . problem," and that a claim of under-regulation "has at least some of the hallmarks of a 'self-inflicted' injury not caused by the agency action."  *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1290 (D.C. Cir. 2007); *cf. Kleppe*, 533 F.2d at 671-72 (state's alleged injury to its

22

"ability to look after the well-being of its citizens" would "result from the action or inaction of the state itself" "where there is no assertion of active disruption of state . . . efforts" by the federal government").

The alleged increased regulatory burden on the State Plaintiffs would thus result from the exercise of their own sovereignty to create and enforce their own laws—a burden attributable to a state's lawmaking, not the federal government, which has not interfered with the States' prerogative in creating or enforcing such laws.  Indeed, taking Plaintiffs' argument to its logical conclusion, a state could establish an injury in fact any time it prefers that the federal government bear the burden of enacting and enforcing a law, even if the state itself remains free to adopt it.  Such a purported injury amounts to a "generally available grievance about government" that "does not state an Article III case or controversy."  *Lujan*, 504 U.S. at 574-75.

That leaves D.C., which (unlike the State Plaintiffs) allegedly passed a law "[i]n response to the 2017 Interim Final Rule"—*i.e.*, *not* the 2018 Rule that is challenged in this case—to impose the stricter whole grain requirement from the prior 2012 Rule.  Compl. ¶ 127.  But here too, Plaintiffs merely allege possible, rather than clearly imminent, future injuries in the form of "the greater effort needed to procure whole grain-rich products" and "the need to develop and implement its own training techniques and compliance tools."  *Id.* ¶¶ 129-30.  What's more, these allegations cannot be squared with D.C.'s own determination that the whole grain requirement it enacted would have *no fiscal impact* on its budget and financial plan.  *See* note 8, *supra*.  Nor can they be reconciled with the fact that school food authorities nationwide—at one point, about 80 percent of them—*did* previously implement the only-whole-grain-rich-product standard; D.C. nowhere explains why the 2018 Rule forces it to make greater efforts to procure

23

whole grain-rich products, or develop its own techniques and tools, to re-implement a standard it ostensibly used before.

And even if these allegations suffice to demonstrate that D.C. suffered an injury in fact, Plaintiffs cannot demonstrate causation.  Plaintiffs must show that such injuries were "the consequence of the defendants' actions."  *Fair Hous. in Huntington Comm., Inc. v. Town of Huntington*, 316 F.3d 357, 363 (2d Cir. 2003).  But here, D.C. considered the stricter whole grain requirement it now touts as a basis for its injuries as early as June 2017—*before* both the 2018 Rule and the 2017 Interim Rule (which, again, is not challenged here).  *See* note 7, *supra*.  This timing—*i.e.*, the allegedly burdensome local government act preceding the ostensibly federal action alleged to have necessitated the local act—forecloses any showing of causation necessary for standing.  *See Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir. 1984) ("An effect never precedes its cause.").  And in any event, those alleged injuries (as with the State Plaintiffs' concerns over increased regulatory burdens) are self-inflicted, because no state or locality is obliged to adopt measures stricter than the 2018 Rule; they merely are permitted to do so.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction.

Dated: New York, New York
       August 26, 2019

                                     Respectfully submitted,

                                     GEOFFREY S. BERMAN
                                     United States Attorney
                                     Southern District of New York

By:     */s/ Casey K. Lee*
            CASEY K. LEE
            Assistant United States Attorney
            86 Chambers Street, Third Floor
            New York, New York 10007
            Tel.: (212) 637-2714
            Fax: (212) 637-2686
            casey.lee@usdoj.gov

25