USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 4/16/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STATES OF NEW YORK, CALIFORNIA, :
ILLINOIS, MINNESOTA, NEW MEXICO, :
and VERMONT, and THE DISTRICT OF :
COLUMBIA : 1:19-cv-2956 (ALC)
 :
                    Plaintiff, : **OPINION AND ORDER**
 :
        -against- :
 :
UNITED STATES DEPARTMENT OF :
AGRICULTURE, UNITED STATES :
-------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff-States of New York, California, Illinois, Minnesota, New Mexico, and Vermont, and the District of Columbia brought this action against the United States Department of Agriculture, the United States Department of Agriculture and Food and Nutrition Service, and Sonny Perdue in his official capacity as Secretary of Agriculture (together, "Defendants" or "USDA"), claiming that the promulgation of an Agency rule in 2018—which provided schools flexibility in complying with certain sodium and whole grain requirements previously adopted in a 2012 rule—violated substantive and procedural requirements of the Administrative Procedure Act ("APA"). (ECF No. 44 or "Am. Compl."). Defendants now move to dismiss on jurisdictional grounds (ECF Nos. 41, 42 or "Def. Br."). For the following reasons, that motion is DENIED.

**I. Factual Background**

The National School Lunch Act and the Child Nutrition Act require the Defendants to ensure that school-served meals meet national nutritional requirements. (Am. Compl. at ¶ 8). "As initially enacted, both Acts require USDA to prescribe

1

nutritional requirements 'on the basis of tested nutritional research.'" (*Id.*) (quoting 42 U.S.C §§ 1758(a)(1)(A), 1773(e)(1)(A)). Congress has consistently reinforced that mandate, most recently in 2010, "by requiring USDA to update nutritional requirements based on a 2009 study by the Food and Nutrition Board, which is part of the National Academy of Sciences." (*Id.* at ¶¶ 8, 49) (citing Pub. L. No. 111-296, § 201) (codified at 42 U.S.C. § 1753(b)(3)(A)).

"Federal funding for school meals is provided in the form of reimbursements for each meal served that meets the nutritional requirements in USDA's regulations." (*Id.* at ¶ 31) (citing 7 C.F.R. §§ 210.7, 220.9). "Meals that are served free or at a reduced price to children from lower-income families are reimbursed at higher rates." (*Id.*) (citing 83 Fed. Reg. 34,105-07 (July 19, 2018); 7 C.F.R. §§ 210.4(b), 220.9(b)). Additionally, USDA "directly purchases food for school meals ('USDA Foods') and provides it to school food authorities, often through a state agency. Each school food authority receives an annual allotment to procure USDA Foods." (*Id.* at ¶ 32) (citing 7 C.F.R. § 250.56(c)); *see* 7 C.F.R. § 250.56(a)–(b)).

In 2012, the USDA promulgated a rule pursuant to the statutory mandates of Congress establishing nutritional standards for school meals based on the Dietary Guidelines for Americans and the 2009 Nutrition Board Study. (*Id.* at ¶¶ 50–51) (citing 77 Fed. Reg. 4088 (Jan. 26, 2012)) (codified at 7 C.F.R. §§ 210.10, 220.8) ("2012 Rule"). "Before issuing the 2012 Rule, USDA had issued a proposed rule in 2011 and considered 133,268 public comments on the proposed rule." (*Id.* at ¶ 52) (citing 77 Fed. Reg. at 4089). Of particular relevance here, the 2012 Rule restricted sodium and increased the whole grains provided in students' lunches. With respect to sodium, the Rule required

schools to reduce the sodium in school meals over a ten-year period, with ultimate goals of a roughly 25% reduction in breakfasts and a roughly 53% reduction in lunches (Sodium Target 3). Schools had to meet two intermediate sodium targets (Sodium Target 1 and Sodium Target 2) within that ten-year period at the two- and four-to-five-year marks. (*Id.* at ¶¶ 59–60); 77 Fed. Reg. at 4097–98, 4147, 4155–57.

By the 2014-2015 academic year, schools needed to decrease sodium levels by roughly 5 to 7% in breakfasts and by roughly 10% in lunches (Sodium Target 1); 77 Fed. Reg. at 4097–98, 4146, 4155. By the 2017-2018 academic year, schools were required to reduce breakfast sodium levels by roughly 15 to 17% and lunch sodium levels by about 32 percent (Sodium Target 2). *Id.* "The compliance date for the final sodium target was school year 2022–2023" (Sodium Target 3). (Am. Compl. at ¶ 61).

The 2012 Rule also required that for the 2012-2013 and 2013-2014 school years, half of the grain products offered by schools at breakfast and lunch needed to be whole-grain rich, meaning comprised of at least 51% whole grains. (Am. Compl. at ¶ 66) (citing 77 Fed. Reg. at 4093, 4144–45, 4155–56). In the 2014-2015 year and beyond, schools could serve only whole-grain rich items. (*Id.* at ¶ 67) (citing 77 Fed. Reg. at 4093, 4144–45, 4156).

Beginning in late 2011, before the 2012 Rule was even finalized, Congress provided schools with flexibility in meeting the proposed sodium and whole grain requirements. In the *Consolidated and Further Continuing Appropriations Act*, Congress prohibited the implementation of a sodium reduction greater than the parameters of the 2012 Rule's Target I, or two-year target. *See Consolidated and Further Continuing Appropriations Act*, 2012, Pub. L. 112–55, § 743(2) (Nov. 18, 2011). Congress renewed

this prohibition multiple times, limiting the sodium reduction requirement to Target 1 throughout the 2017–2018 school year. *See Consolidated and Further Continuing Appropriations Act*, 2015, Pub. L. 113–235 § 752 (Dec. 16, 2014); Consolidated and Further Continuing Appropriations Act, § 733(b) (Dec. 18, 2015) ("2016 Act"); *Consolidated and Further Continuing Appropriations Act*, 2017 Pub. L. 115-31 § 747(b) (May 5, 2017) ("2017 Act"); *Consolidated and Further Continuing Appropriations Act*, 2018 Pub. L. 115-56 div. D § 101(a) (Sept. 8, 2017) ("2018 Act"). Similarly, in 2014, Congress instructed that States could grant an exemption to the only whole grains requirement where a school could demonstrate hardship "in procuring specific whole grain products which are acceptable to the students and compliant with the whole-grain-rich requirements," Pub. L. 113-235 § 751. Under the exemption, half, as opposed to all of the school's grains products were required to be whole-grain rich. *Id.* The exemption program was set to expire after the 2017-2018 school year.

In 2017, the USDA promulgated an interim final rule extending additional deadlines present in the 2012 Rule. (Am. Compl. at ¶ 74) (citing 82 Fed. Reg. 56,703 (Nov. 30, 2017). The 2017 Interim Rule extended the Sodium Target 1 requirement through the academic year of 2018-19, meaning schools would not be required to comply with Target 2 until the 2019-20 school year. (*Id.* at ¶ 75) (citing 82 Fed. Reg. 56,704) (codified at 7 C.F.R. §§ 210.10(f)(3), 220.8(f)(3)). The product waiver program for the whole grain mandate was also extended through the school year 2018-2019. (*Id.* at ¶ 76) (citing 82 Fed. Reg. at 56,704) (codified at 7 C.F.R. §§ 210.10(c), 220.8(c)).

The USDA did not provide the public with notice or an opportunity to comment until after the 2017 Interim Final Rule had been issued. (*Id.* at ¶ 77–78).

4

In 2018, the USDA issued a final rule granting schools flexibility in reducing their sodium content and increasing whole grain availability. (*Id.* at ¶ 79) (citing *Child Nutrition Programs: Flexibilities for Milk, Whole Grains, and Sodium Requirements*, 83 Fed. Reg. 63, 775 (Dec. 12, 2018) (codified at 7 C.F.R. § 210.10; 7 C.F.R. § 220.8) (the "2018 Rule"). The 2018 Rule eliminated the 2012 Rule's final sodium reduction targets, which would have gone into effect in the 2022–2023 school year, and delayed by five years the implementation of Sodium Target 2 requirements, which would have gone into effect in the 2018 school year. (*Id.* at ¶¶ 80, 87) (citing 83 Fed. Reg. 63,776, 63-787). In other words, schools only had to satisfy Target 1's requirements until the beginning of the 2024–25 academic year, when Target 2 requirements would take effect.

The 2018 Rule also relaxed significantly the 2012 Rule's whole grains framework. The new rule eliminated entirely the requirement that schools ultimately serve only whole-grain-rich products, leaving in place the requirement that half of a school's weekly grain products be whole-grain rich. (*Id.* at ¶ 95) (citing 83 Fed. Reg. at 63,776). Again, under the 2012 Rule, schools were required to begin providing 100% whole-grain-rich products beginning in the 2014-2015 academic year. (*Id.*)

The 2018 Rule sets minimum nutritional standards. States are free to impose additional or stricter requirements. *See* 7 C.F.R. § 210.19(e).

## II. Procedural Background

The Plaintiffs filed their two-count complaint against the USDA and other Defendants on April 3, 2019. (ECF No. 1). They amended their complaint on September 16, 2019. (ECF No. 44). The amended complaint claims first, that Defendants violated the APA because the 2018 Rule was promulgated without notice and comment, and thus,

5

its provisions should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D). (Am. Compl. at ¶¶ 138–44). Second, Plaintiffs claim that the provisions in the 2018 Rule eliminating the final sodium target, delaying compliance with sodium target 2, and cutting in half the whole-grain-rich requirement, are inconsistent with the goals of the most recent Dietary Guidelines for Americans and the Nutrition Board's 2009 recommendations, and thus, are contrary to the School Lunch and Child Nutrition Acts and should be held unlawful under the APA, 5 U.S.C. § 706(2)(A). (*Id.* at ¶¶ 145–50). Third and finally, the States claim that the 2018 Rule is arbitrary and capricious and should be set aside under the APA, 5 U.S.C. § 706(2)(A). (*Id.* at ¶¶ 151–57).

Plaintiffs brought this suit in both their *parens patriae* and proprietary capacities. (*Id.* at ¶¶ 105–26, 127–37). On August 26, 2019, Defendants filed the instant motion to dismiss Plaintiffs' complaint in its entirety, arguing that the States lack standing for either type of suit. (ECF No. 41).

**III. Legal Standard**

"To defeat a 12(b)(1) motion, a plaintiff must establish subject matter jurisdiction by a preponderance of the evidence." *Vullo v. Office of the Comptroller of the Currency*, 17 Civ. 3574, 2017 WL 6512245, at *5 (S.D.N.Y. Dec. 12, 2017) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When considering a Rule 12(b)(1) motion, the court "'must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction.'" *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 146 (E.D.N.Y. 2017) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

6

### IV. Analysis—Standing

Standing is one element of Article III's case and controversy requirement. U.S. CONST. art. III, § 2. Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). When, as here, there are multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1651 (2017); *Massachusetts, et al. v. E.PA.*, 549 U.S. 497, 518 (2007).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements for each claim asserted." *Vullo*, 2017 WL 6512245, at *7 (citing *Spokeo, Inc.*, 136 S. Ct. at 1547). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61). "A plaintiff need not, however, demonstrate that the defendant was the proximate or 'but-for' cause of the injury-in-fact." *Batalla Vidal*, 295 F. Supp. 3d at 155.

Here, where a state is a plaintiff, "the ordinary rules of standing" are modified. *See id.* at 158. State Plaintiffs can have three types of interests in litigation, "proprietary," "sovereign," or "quasi-sovereign" interests. *See Alfred L. Snapp. & Son, Inc., et al. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982).

Proprietary interests are those the state may invoke as a private party. They are interests like land ownership or participation in a business venture, where the state "[a]s a

proprietor, is likely to have the same interests as other similarly proprietors…[who] may at times need to pursue those interests in court." *Id.* at 601–02.

Sovereign interests fall squarely within the state's interest in acting like a state. Easily identified, qualifying interests include, for example, "the exercise of sovereign power over individuals and entities within the relevant jurisdiction…[which] involve[d] the power to create and enforce a legal code, both civil and criminal" and "the demand for recognition from other sovereigns…[which] involve[d] the maintenance and recognition of borders." *Id.* at 601.

Quasi-sovereign interests are characterized less easily. Quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." *Id.* at 602. A more specific "articulation of such interests is a matter for case-by-case development." *Id.* at 607. States may enforce their quasi-sovereign interests pursuant to the *parens patriae* doctrine, "which is a judicial construct that does not lend itself to a simple or exact definition." *Id.* at 601. "In general, however, the Court has recognized that a state has [enforceable] quasi-sovereign interests in the 'health and well-being—both physical and economic—of its residents in general,' in protecting state 'residents from the harmful effects of discrimination,' and in challenging the discriminatory denial of a state's 'rightful status within the federal system.'" *Batalla Vidal*, 295 F. Supp. 3d at 161 (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607, 609).

"There are, however, at least two notable limitations on states' parens patriae standing." *Id.* "First, to be 'quasi-sovereign,' the state's interests must be sufficiently generalized that the state is seeking to vindicate its citizens' welfare, rather than simply pressing suit on behalf of its individual residents." *Id.* (quoting *Alfred L. Snapp & Son*,

458 U.S. at 607). The second limitation is more complicated but arises only when a state brings a *parens patriae* suit against the federal government. In *Commonwealth of Massachusetts v. Mellon*, the Supreme Court provided that Massachusetts could not sue the United States government for enforcing a federal statute that Massachusetts claimed was unconstitutional. 262 U.S. 447, 485 (1923) ("the citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof"). In *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, the Court reaffirmed its holding in *Mellon* in a footnote, citing *Mellon* for the proposition that "[a] state does not have standing as *parens patriae* to bring an action against the Federal Government." 458 U.S. at 601 n. 16.

But since *Mellon* and *Snapp*, the Supreme Court has noted that "[t]he cases on the standing of states to sue the federal government seem to depend on the kind of claim that the state advances." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S.Ct. 2652, 2664 n. 10 (2015) (quoting R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 263–66 (6th ed. 2009). "[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Massachusetts,* 549 U.S. at 520 n. 17. Regardless, circuit courts that have addressed this issue have determined the type of suit to be irrelevant. They have held that states cannot sue the federal government in *parens patriae*, period. *See, e.g. Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80 (D.C. Cir.

9

2019); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009); *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).

Plaintiffs sued the USDA to enforce both their quasi-sovereign and proprietary interests. Plaintiffs allege that the 2018 Rule implicated their quasi-sovereign interests by endangering the physical well-being of resident children who eat meals in public schools. (Am. Compl. at ¶¶ 105–27). States' proprietary interests are implicated, Plaintiffs allege, because their health care costs will rise in response to the 2018 Rule's adjustment to nutritional standards. (Am. Compl. at ¶¶ 128–32).

In their motion to dismiss, Defendants argue that Plaintiffs lack standing to bring either a *parens patriae* or proprietary suit. (Defs' Brief). First, Defendants argue that under *Mellon* and *Snapp*, States cannot bring *parens patriae* suits against federal government agencies, period. (*Id.* at 13–17). The District of Columbia, Defendants contend, also lacks the requisite sovereignty to bring such a suit. (*Id.* at 17). Second, Defendants argue that even if a *parens patriae* suit were not outright barred in this context, Plaintiffs' suit would still fail because they did not allege an injury in fact to their quasi-sovereign interests. (*Id.* at 18–21). Third, Defendants assert that Plaintiffs failed to allege an injury in fact related to their proprietary interests, and Plaintiffs therefore lack standing to bring this suit against the USDA even in their individual capacities. (*Id.* at 21–24).

Because I conclude the States have standing to enforce their proprietary interests, I need not reach the question of whether a *parens patriae* suit against the federal government in this context is permissible or whether Plaintiffs have alleged a quasi-sovereign interest sufficient to confer standing.

A. Proprietary Standing

Plaintiffs allege that the 2018 Rule will lead to adverse health effects in children residing in the States, which will, in turn, raise the States' healthcare costs. (Am. Compl. at ¶¶ 128–32). In particular, they argue that their health care costs would have decreased if Sodium Target 2 had taken effect and that the health care costs paid by some of the States for conditions related to low-whole-grain diets will increase as a result of Rule 2018's lowering of the whole-grain requirement. (Am. Compl. at ¶¶ 131–132). The USDA argues that this injury is too speculative to confer standing. I disagree.[1]

**1. Type of 12(b) Motion**

As a preliminary matter, Defendants argue that because they proffered evidence beyond the complaint challenging Plaintiff's alleged grounds for standing, Plaintiffs had to come forward with evidence to contradict Defendants. (Defs. Brief at 12).

> When a Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "pleading"), the plaintiff has no evidentiary burden. The task of the district court is to determine whether the Pleading allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue…Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading. In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion…reveal the existence of factual problems' in the assertion of jurisdiction. However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence

---

[1] D.C. alleges a unique proprietary interest. "In response to the 2017 Interim Final Rule, the District of Columbia passed the Healthy Students Amendment Act of 2018 which impose[d] the 2012 Rule's whole grain requirement." (Am. Compl. at ¶ 134 (citing D.C. Law 22-240)). The new D.C. rule requires that "[a]ll grain products…be whole grain-rich[.]" (*Id.* at ¶ 135). D.C. argues that it suffers an increased regulatory burden because of the 2018 Rule. Because its new rule raises the requirements of the federal-floor, D.C. will need to "develop and implement its own training techniques and compliance tools for schools," (*Id.* at ¶ 136), and "school food authorities in the District of Columbia will have to make greater effort[s] to procure whole grain-rich products than [they] would have if USDA had not lowered the 2012 Rule's whole grain requirement." (*Id.* at ¶ 137). The USDA argues that this interest also does not confer standing. Again, only one plaintiff need have standing for a suit to go forward. Because I conclude that the other Plaintiffs, the States have standing based on their rising healthcare costs, I need not determine whether D.C.'s injury would be sufficient on its own.

11

> proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.

*Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (internal citations and quotation marks omitted) (alterations in original).

Defendants argue that they brought forward qualifying controverting evidence in their motion to dismiss. In particular, Defendants emphasize that they presented several factual problems with Plaintiffs' injury allegations. First, the USDA argues that Plaintiffs' allegation that their healthcare costs would have decreased if the 2012 Rule's sodium target timeline had been followed is irreconcilable with Plaintiffs' amended complaint. The 2012 Rule called for Sodium Target 2 to take effect at the beginning of the 2017-2018 academic year. However, Congress subsequently required only Target 1 to be applied that year and the 2017 Interim Rule provided for the same. If Plaintiff's allegations are true, the USDA argues, then the States' health care costs should have risen in the 2017-2018 and 2018-2019 academic years. However, Plaintiffs failed to allege specific rises in healthcare costs during these time periods or that the implementation of Target 1 resulted in any decreased health care costs as compared to the States' healthcare costs prior to the implementation of any sodium reduction requirement. (Defs. Reply at 3).

The USDA raises a similar argument with respect to whole grains. First, the 2012 Rule initially required all of schools' grain products to be whole-grain rich, but in 2017-2018, over 4,100 school districts were granted exemptions, under which only half of the exempted districts' whole-grain products needed to be whole-grain rich. The States did not allege that health care costs were higher when schools were granted exemptions. (Def. Reply at 3–4).

12

Defendants argue that they presented evidence of a "factual problem with Plaintiffs' claims of increased future health care costs resulting from the 2018 Rule"—specifically, they showed that—"similar circumstances have occurred in the past, yet apparently did not impose greater health care costs on Plaintiffs." (Def. Reply at 4). According to the Defendants, this evidence converted its Rule 12(b)(1) motion into a fact-based motion and Plaintiffs were required, but failed to offer refuting evidence.

The States disagree with this characterization of Defendants' "evidence." The States argue that Defendants' alleged evidence does not contradict the jurisdictional allegations that States have or will incur higher health care costs under the 2018 Rule. I agree. Defendants do not offer actual evidence, but rather point out the absence of certain evidence in Plaintiff's amended complaint. Although this absence may be persuasive to a fact-finder, it is not the type of affirmative evidence sufficient to place an added evidentiary burden on plaintiffs. To require the States to produce rebuttal evidence, Defendants would have to submit evidence that the 2018 Rule, as opposed to Congress's pre-2018 Rule actions, would not impact state health care costs. *See DaCorta v. AM Retail Group, Inc.*, No. 16 Civ. 01748, 2018 WL 557909, at *6 (S.D.N.Y. Jan. 23, 2018) (12(b)(1) motion not "converted" where Defendants' evidence addressed "the extent of Plaintiff's injury—not whether one exists"). Defendants offered no such evidence. Accordingly, Plaintiffs were entitled to rely on the pleadings alone.

**2. Healthcare Costs**

The USDA argues that the alleged increase in State healthcare costs is too speculative an injury and not fairly traceable to the 2018 Rule. Defendants argue further that the alleged adverse health effects are "just possible, not imminent" and rising

healthcare costs caused by those hypothetical health effects is an even more attenuated injury. Neither the health effects nor resulting costs, Defendants contend, are fairly traceable to the 2018 Rule's sodium restrictions and whole-grain-rich requirements specifically. (Def. Brief at 21–24). Again, I disagree.

First, Plaintiffs allege a clear nexus between high sodium, lower whole-grain-rich diets and adverse health effects in children. For example, the amended complaint provides that the Dietary Guidelines recommend that "children and adults [] limit sodium intake to lower the risk of chronic diseases," (Am. Compl. at ¶ 110) (quoting 77 Fed. Reg. at 4097) (alteration in original), and that in issuing the 2012 Rule, the USDA found that "high-sodium diets adversely affect students' cardiovascular health and increase the risk of chronic cardiovascular disease." (*Id.* at ¶ 109) (citing 77 Fed. Reg. at 4097–98, 4133).

Further, Plaintiffs explained why even the differences between the 2012 Rule's and 2018 Rule's requirements could be significant. For example, the amended complaint explained that the 2015-2020 Dietary Guidelines "state that 'at least half' of the grains consumed by children and adults 'should be whole grains,' which is the equivalent of consuming 100% whole-grain rich products." (Am. Compl. at ¶ 121). But under the 2018 Rule, a 100% whole-grain rich menu in schools is no longer a required target, let alone an imminent one. With respect to sodium, Plaintiffs cite the USDA's own finding that even *modest* reductions in sodium intake can reduce cardiovascular events and medical costs. *See* (Am. Compl. at ¶¶ 58, 118); *see* 77 Fed. Reg. at 4133. Additionally, the amended complaint cited the 2009 Nutrition Board Study's finding that "each reduction in the sodium content of school meals will be beneficial to the nation's children." (*Id.* at ¶ 111).

Plaintiffs' inability to allege that school children *are* experiencing or *definitively will* experience chronic diseases or cardiovascular symptoms, does not mean that these injuries are not concrete or too speculative to confer standing. The alleged *present risk* of harm is enough. The distinction lies in where the uncertainty exists.

In *Clapper v. Amnesty International, USA*, the Supreme Court rejected arguments from Plaintiffs—human rights, labor, legal, and media organizations—that they had standing to challenge a statute allowing for the interception of foreign communications. 568 U.S. 398 (2013). Plaintiffs asserted they had standing because there was an "objectively reasonable likelihood that their communications with their foreign contacts [would] be intercepted…" *Id.* at 410. The Court determined this injury to be speculative because it was still unclear whether, among other things, the Government would choose to invoke its authority under the statute, the Government's proposed procedures would withstand Fourth-Amendment scrutiny, or if the Plaintiffs would be parties to the communications the Government would attempt to intercept. *Id.* at 410–14. In short, Plaintiffs' theory of standing was dependent upon a highly attenuated chain of possibilities such that the threatened injury was not impending. *Id.*

In *Clapper*, there were multiple events that had to occur before even the risk of harm to Plaintiffs was imminent, so the denial of standing in that case does not mean "that the risk of real harm cannot satisfy the requirement of concreteness." *Spokeo, Inc.*, 136 S.Ct. at 1549. In this case, unlike in *Clapper*, the *risk* of injury is imminent in that the 2018 Rule has been promulgated and put it into effect.

Plaintiffs also allege adequately the connection between these adverse health effects and their healthcare costs. They explain that many of the students who participate in the

15

school breakfast and lunch programs are low- and moderate-income state residents. When school meals are high in sodium and low in whole grains they are less healthy, and less healthy foods lead to conditions like high blood pressure, type two diabetes, and obesity. All of these conditions lead to higher health care bills. Because States subsidize healthcare costs for low- and moderate-income residents—the same residents consuming these less healthy meals—they are likely to endure some of the increased healthcare costs that will result from these conditions. (Am. Compl at ¶¶ 128–132).

Defendants argue that this proprietary injury is even more speculative than Plaintiffs' alleged quasi-sovereign injury in the health and well being of school children and far too attenuated. However, as Plaintiffs note, the USDA itself identified at least the link between the school meals program and healthcare costs in promulgating its 2012 Rule. (Am. Compl. at ¶ 128). The USDA noted "[t]he linkage between poor diets and health problems such as child obesity" and that childhood obesity "imposes substantial economic costs" including "an estimated $3 billion in direct medical costs." 77 Fed. Reg. at 4107, 4133. Additionally, the USDA continued, "obese children and adolescents are more likely to become obese as adults" and medical spending attributed to the adult obesity epidemic in 2008 was an estimated $147 billion. *Id.* The USDA acknowledged that it could not "define a level of disease or cost reduction that is attributable to the changes in meals expected to result from implementation of the [2012] rule" but explained that because "the rule [was] projected to make substantial improvements in meals served to more than half of all school-aged children on an average school day, [the agency] judge[d] that the likelihood is reasonable that the benefits of the rule exceed[ed] the costs[.]" *Id.*

This court has found an increase in state healthcare costs to be a sufficient injury in similarly attenuated circumstances. In *New York v. United States Department of Homeland Security*, this court considered Plaintiff-States' challenge to a rule promulgated by the Department of Homeland Security ("DHS"), which amended the so-called public charge rule. 408 F. Supp. 3d 334 (2019), *overruled on other grounds*, 140 S.Ct. 599 (2020) (granting Defendants' application to stay the District Court's orders granting preliminary injunction pending disposition of Government's appeal to the Second Circuit); *see Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41292-01 (Aug. 14, 2019). Pursuant to The Immigration Nationality Act ("INA"), the federal government may deny admission or adjustment of status to any noncitizen, who, in the government's opinion, is "likely at any time to become a public charge." *See id.* at 340 (quoting 8 U.S.C. § 1182(a)(4)(A)). The new rule redefined the terms "public charge" and "public benefit" and provided "a new framework for assessing whether a noncitizen is likely at any time to become a public charge." *Id.* at 340–42. Plaintiffs brought this action against DHS, The United States Citizenship and Immigration Services ("USCIS"), the Acting Secretary of DHS, the Acting Director of USCIS, and the United States of America seeking "(1) a judgment declaring that the Rule exceeds Defendants' statutory authority, violates the law, and is arbitrary and capricious and an abuse of discretion; (2) a vacatur of the Rule; and (3) an injunction enjoining DHS from implementing the Rule." *Id.* at 340. Pursuant to Fed. R. Civ. P. 65, Plaintiffs moved "for a preliminary injunction enjoining Defendants from implementing or enforcing the Rule which [was] scheduled to take effect" later that month, as well as "for a stay postponing the effective date of the Rule pending adjudication of this action on the merits." *Id.*

Defendants argued, among other things, that Plaintiffs lacked standing because they failed to allege an injury in fact. *Id.* at 342–43. The court disagreed, finding that Plaintiffs adequately demonstrated that the Rule would chill participation in benefits programs like Medicaid, "reduc[ing] Plaintiffs' consumers and revenue…while simultaneously shifting costs of providing emergency healthcare and shelter benefits from the federal government to Plaintiffs, who offer subsidized healthcare services." *Id.* at 343. Additionally, the States alleged they would suffer "increased healthcare costs as noncitizen patients avoid preventative care." *Id.* The court determined these injuries sufficient for standing.[2]

The injury in the public charge case, as here, is a risk of fiscal harm. Defendants' conduct here similarly imposes this risk indirectly, in that the conduct *directly* affects third parties, which *in turn* inflicts a financial burden on the states. To the extent the USDA is arguing that the States' ability to go above USDA nutritional requirements defeats standing, *New York v. United States Department of Homeland Security* refutes that argument. In that context, the States, in theory, were free to take steps to alleviate the financial effects of the new public charge rule by altering the rate at which they subsidize health care services. Yet, this court still correctly held that standing existed. While a self-inflicted injury cannot create standing, where a defendant inflicts an injury, plaintiff's

---

[2] *See also Massachusetts v. United States Dep't of Health and Human Services*, 923 F.3d 209, 212, 222–23 (1st Cir. 2019) (Massachusetts had standing in suit to enjoin enforcement of two federal Interim Final Rules ("IFRs") which "permitted employers with religious or moral objections to contraception to obtain exemption from providing health insurance coverage to employees and their dependents for…contraceptive care[,]" coverage which would otherwise be required by Affordable Care Act guidelines, because Massachusetts demonstrated an imminent fiscal injury—"a substantial risk that the rules will cause women in the Commonwealth to lose their contraceptive coverage…[a] substantial likelihood that some of these women will obtain state-funded contraceptive services or prenatal and postnatal care for unintended pregnancies, and this that the Commonwealth will incur costs as a result.").

*potential* ability to mitigate the damage done by the defendant does not prevent establishment of an injury in fact.

## V. Conclusion

Plaintiff States alleged an injury in fact to their proprietary interests and thus, have established standing. Accordingly, Defendants' 12(b)(1) motion to dismiss is DENIED.

**SO ORDERED.**

Dated: **April 16, 2020**
      New York, New York

                                    **ANDREW L. CARTER, JR.**
                                    **United States District Judge**